### OWENS v. UNITED STATES.
#### No. 49452.

United States Court of Claims.
June 3, 1952.

Bernard J. Gallagher, Washington, D. C., for the plaintiff. J. Roy Thompson, Jr., Washington, D. C., was on the briefs.

Louis R. Mehlinger, Washington, D. C., with whom were Acting Asst. Atty. Gen. Newell A. Clapp, and Asst. Atty. Gen. Holmes Baldridge, for the United States. Edward L. Metzler, Washington, D. C., and Francis X. Daly, Boston, Mass., were on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This claim is presented under the War Contracts Hardship Claims Act, known as the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 992, 41 U.S.C.A. § 106 note, to recover from the United States $109,039.41 as the net loss alleged to have been sustained by plaintiff in the performance of Government contracts between September 16, 1940, and August 14, 1945. The Government moves for summary judgment on the ground that there is no genuine issue as to an essential preliminary requirement under the Lucas Act in that plaintiff did not file a written request for the type of relief contemplated by that Act, with a department of defendant prior to August 14, 1945. Plaintiff has filed a cross-motion for summary judgment on the ground that there is no issue as to any material fact in that plaintiff did file, on or before August 14, 1945, with a department of defendant, written requests for relief from losses within the meaning of the Lucas Act, and that the losses were incurred without fault or negligence on plaintiff's part.

The facts alleged in the petition and contained in documents submitted by the parties in connection with the present motions, reveal that on February 27, 1945, plaintiff entered into a War Housing Project contract[1] with the National Capital Housing Authority for the construction of 440 dwelling units designated as The Lincoln Heights Dwellings. Notice to proceed was given plaintiff on March 2, 1945, effective March 12, and the work was to be completed within 280 consecutive calendar days, by December 6, 1945. Because of various delays which the Contracting Officer found to be excusable, the contract time was extended 379 calendar days to December 20, 1946. Early in 1947 plaintiff filed two claims with the contracting agency; one claim requesting monetary relief under the contract, and the other requesting relief under the Lucas Act. On May 18, 1949, the head of the contracting department denied plaintiff's contract claim. On July 22, 1949, the contracting department denied plaintiff's claim for losses under the Lucas Act.

It is defendant's position that the letters relied on by plaintiff as "requests for relief" within the meaning of Section 3 of the Lucas Act, were not sufficient to apprise the contracting agency that it was being asked to grant extra-legal relief under the First War Powers Act, 50 U.S.C.A.Appendix, § 601 et seq. for losses sustained in the performance of its housing contract. Fogarty v. United States, 340 U.S. 8, 71 S.Ct. 5, 95 L.Ed. 10.

Section 3 of the Lucas Act provides in part as follows:

"Claims for losses * * * shall be limited to losses with respect to which a written request for relief was filed with such department or agency on or before August 14, 1945, * *."

By August 14, 1945, the work under plaintiff's contract was only 35 percent complete and plaintiff had already experienced certain delays and difficulties which were the subject matter of a series of letters to the contracting agency. These letters, dated prior to August 14, 1945, are relied on by plaintiff as constituting notice to the Government that equitable or extra-legal relief under the First War Powers Act was being requested.

The first group of letters, dated April 28, May 25, June 21, and July 10, 1945, de-

---

1. Contract No. A.D. (H) 3643, War Housing Project No. D.C. 1–13.

scribed to the Government plaintiff's difficulty in procuring heating boilers because of the low priority rating assigned to the project. The letter of April 28 advised defendant of the "contemplated delay" in procuring the necessary boilers and of the necessity for a better priority rating. The letter closed with a request for the agency's recommendations with respect to the problem. The letter of May 25, 1945, reviewed the boiler situation and requested an extension of the contract time, "the number of days to be determined upon delivery of the boilers to the project." The letter of June 21 acknowledged the granting of a better priority for the boilers on the project and stated that even with the better priority, a considerable delay in procuring the boilers would ensue. Plaintiff advised the agency that a more expensive boiler carrying a AA–1 priority might be obtained more quickly and the letter closed with an inquiry as to whether the agency would consider the use of the more expensive boiler. The letter of July 10 forwarded to the agency certain information from plaintiff's supplier relative to the boilers and closed with a statement that ultimately plaintiff would request an extension of time for the delay occasioned by the difficulty of obtaining the boilers under the old low priority rating.

In our opinion none of the above letters were sufficient to place the agency on notice that it was being asked to grant plaintiff extra-legal relief under the First War Powers Act. That the agency was not in fact on such notice is further borne out by its Change Order No. G–26, issued November 27, 1945, extending the contract time 10 days and stating that such extension was granted in response to plaintiff's letters of May 25 and July 10, 1945, relative to the "lack of boilers." The change order also refers to Article 9(c) of the Contract and Paragraph 2.d of Special Conditions. Plaintiff accepted this change order on December 7, 1945, without any change in the contract price.

Another group of letters relied on by plaintiff is concerned with delay in commencing plastering work due to inability to secure rock lath for the 2-inch partitions specified in the contract (sometimes referred to as gypsum board or wallboard). Plaintiff's letter of July 4, 1945, was in response to a letter from the contracting agency asking for a report on certain items listed therein as causing delay in the work. With respect to the "wallboard," plaintiff stated that it had contacted all the known sources but that the product was apparently not available at that time. In another letter dated July 4, 1945, plaintiff advised defendant that several other jobs in the locality of plaintiff's project were tied up because the wallboard was not available and that the U. S. Gypsum Co. was apparently not making any shipments of the board in that locality; that no other manufacturer had been found to supply the material; that by July 9 plaintiff would be ready to go ahead with the plastering but could not do so if the materials had not arrived. The letter closed with the following statement:

"We would appreciate any suggestions you might have on this matter, as well as a redesign if you deem it necessary."

In a letter dated July 19, 1945, plaintiff reported more fully on the wallboard situation and stated that the difficulty in securing the material was due to a controversy between the manufacturers of lath of that type and OPA over the cost of shipment of the material. Plaintiff suggested that the agency might wish to redesign the partitions in question so that other materials might be used. Plaintiff pointed out in closing that the delay would ultimately add to the cost later on "due to cold weather conditions." Plaintiff states: "If there is anything you can do to help us, please advise." On July 21, 1945, plaintiff wrote to the agency stating that it was ready to start plastering but due to the absence of the rock lath specified for the 2-inch partitions, the plastering could not be commenced. After referring to the letter of July 19, plaintiff stated that it would ask for an extension of time "as soon as the extent of the delay can be ascertained."

With respect to the above group of four letters, we find nothing to indicate that plaintiff was seeking extra-legal relief from losses and the record before us contains no

indication that either party considered such a request to have been made. On December 4, 1945, defendant issued Change Order No. G–29 extending the contract performance time 42 days specifically because of the delay caused by plaintiff's inability to secure the wallboard material. The order states that it is in response to plaintiff's letters of July 4, July 19, and July 21, 1945, all relied on by plaintiff herein, as well as four other letters bearing various dates beginning August 18, up to November 26, 1945, not submitted to the court by plaintiff and apparently not relied upon. The change order was accepted on December 17, 1945, by plaintiff with no change in contract price.

Another group of letters relied on by plaintiff refers to delays caused by a shortage of common labor. These letters are dated May 24, June 4, and June 15, 1945. The letter of May 24 is a summary of the general situation on the job at that time and mentions, among other things, delays due to a shortage of common labor. At the close of the letter plaintiff states that it is writing to acquaint the Government with the delays encountered and "to see whether or not you could give us any assistance in these matters." The letter of June 4 makes reference to the prior letter of May 24 and states that the labor situation has not improved and that to date there have been about 30 days' delay due to labor difficulties. The last sentence of the letter states: .

"Please give this matter your consideration and anything you can do to help us to obtain labor will certainly be appreciated."

The letter of June 15, 1945, reviews the labor situation again and states that the delays occasioned thereby are not the fault of the contractor; that the contractor has done everything in its power to bring the job up to schedule and "have spent money that we did not contemplate spending to do so." The letter closes as follows:

"We are therefore asking an extension of time in the amount of 45 days due to lack of labor alone, and ask that you give this your serious consideration as we feel that you know the statements made in this letter are facts."

Although the last letter mentioned above does inform defendant that plaintiff's costs are exceeding the amount anticipated, the letters on the whole appear to do no more than to ask for an extension of the contract time and an extension was in fact granted by Change Order No. G–10, issued July 9, 1945. This change order gave a 17–day extension of time for such delays and states that it is in response to plaintiff's letters of June 15, June 26 and July 4. This change order was accepted by plaintiff on July 31, 1945, with no change in the contract price. It thus appears that both parties considered the letters now relied on as no more than requests for an extension of time.

Plaintiff also relies on two letters, dated July 10, 1945 and July 11, 1945, relative to a strike of engineers. The letter of July 10, 1945, merely reports to the contracting agency the fact of the strike and that the other building trades would not cross the picket line. The letter of July 11 advises the agency that on that day none of the trades were working because of the strike. Neither letter contained any sort of request for anything. On July 26, 1945, defendant issued Change Order No. G–11 granting plaintiff a four-day extension of time because of delay caused by the strike. The order states that it is issued in response to plaintiff's letter of July 16, which letter has not been submitted to the court. We are unable to see how this group of documents placed defendant on notice that it was being asked to grant extra-legal relief.

Plaintiff further relies on a group of letters dated April 12, April 28, May 9 and June 6, 1945, relative to steel sashes and frames for windows. The letter of April 12 merely advises defendant that certain suppliers do not carry in stock the steel sash and frames called for by the specifications, and plaintiff asks what alternate design or substitute materials can be used. The letter of April 28 refers to the prior letter of April 12 and defendant's reply of April 19 in which defendant requested certain information. Plaintiff enclosed the information requested by defendant and stated that since it was unable to obtain the specified materials and delay might ensue, "we would

appreciate an early recommendation in this matter." The letter of May 9 referred to the two prior letters and stated that the sash and frames or some substitute materials would soon be required and that in order to avoid delay "we again request your early decision in this matter." The letter of June 6 transmitted to defendant for its approval eight copies of shop drawings showing precast lintels, and asked for defendant's early approval.

These letters do no more than ask defendant to redesign the windows because of difficulty in securing the type of frames specified, and warn defendant that unless this is done, delays may result. On December 18, 1945, Change Order G–5 was issued authorizing a change in the design of the steel windows and granting a 14-day extension of time "in accordance with your revised proposal dated October 9, 1945." The change order quotes a portion of plaintiff's letter of that date (which letter has not been relied on by plaintiff in this proceeding) in which plaintiff states that the delay will cost plaintiff considerable money but that plaintiff is not requesting additional payment but only a 14-day extension of time. Plaintiff accepted this change order on December 26, 1945, without change in the contract price. We do not think the documents relied on constitute a request for extra-legal relief.

Plaintiff also relies on two letters dated July 9 and July 25, 1945, relative to a shortage of bricklayers. The letter of July 9 merely calls defendant's attention to the shortage of bricklayers and asks defendant to give any help it can as plaintiff is badly in need of more bricklayers. The letter of July 25 reviews in greater detail the bricklayer shortage situation and closes with the following comment:

"We will appreciate anything you can do to help this situation, and it is causing every bid delay on this job. This delay will add to our cost as well as that of our subcontractors on the job, in the future."

On September 10, 1945, Change Order No. G–17 was issued granting plaintiff an 11-day extension of time of which nine days were given in response to plaintiff's requests of July 9, July 25, and August 20, 1945. Plaintiff does not rely on the last letter and has not produced it. The additional 2-day extension was granted because of the legal holiday declared by the President of the United States marking the end of the war with Japan. This change was accepted by plaintiff on September 17, 1945, without change in the contract price. Apparently the summary letter of August 20, 1945, made the request for the extension of time which was granted.

We cannot see how these letters put the defendant on notice that plaintiff was seeking extra-legal relief from losses. Plaintiff's only mention of possible loss is in the letter of July 25 in which it refers to the possibility of additional costs in the future.

Plaintiff also relies on a letter of June 16, 1945. This letter was in response to defendant's prior letter of June 9, which in turn was in response to plaintiff's letter of May 24 referred to hereinbefore. The letter merely reviews the various causes of delay up to that time and suggests that defendant does not appreciate plaintiff's difficulties, particularly those arising by virtue of the low priority rating assigned. The letter closes with thanks for any assistance already rendered or to be rendered. The specific matters referred to were mentioned in other letters already discussed and ultimately were the subject of change orders.

The bulk of the work on this project was performed after August 14, 1945, and while it is possible that the substantial losses suffered by plaintiff in the performance of this contract may have had their genesis in the delays and shortages about which plaintiff complained prior to August 14, 1945, we cannot find in this record a single request on file with the agency which was sufficient to put that agency on notice that it was being asked to grant extra-legal relief. We are unable, by the terms of the Lucas Act, to consider letters written after August 14, 1945, and the only losses which are pertinent are those suffered in the performance of work prior to that date.

On the basis of plaintiff's petition and the documents produced by the parties, we con-

clude that plaintiff did not file with the agency concerned prior to August 14, 1945, a written request for the type of relief contemplated by the Lucas Act and that there is therefore no genuine issue as to that material fact. Since the letters relied upon have been found to be inadequate, it becomes unnecessary to consider the other legal issues raised by the parties in their briefs. Plaintiff's motion for summary judgment is denied; defendant's motion for summary judgment is granted, and plaintiff's petition dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges.